# United States Court of Appeals
## For the First Circuit

Nos. 15-1506, 16-1085

SMALL JUSTICE LLC; RICHARD A. GOREN; CHRISTIAN DUPONT,
d/b/a Arabianights-Boston, Massachusetts

Plaintiffs, Appellants,

v.

XCENTRIC VENTURES LLC,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Torruella, Kayatta, and Barron,
Circuit Judges.

Richard A. Goren, with whom Law Office of Richard Goren was on brief, for appellants.

Daniel G. Booth and Maria Crimi Speth, with whom Booth Sweet LLP and Jaburg & Wilk, P.C. were on brief, for appellee.

Paul Alan Levy, Public Citizen Litigation Group, Christopher Bavitz, Berkman Center for Internet and Society, Mitch Stoltz, Kit Walsh, Corynne McSherry, on brief for amici curiae Public Citizen, Inc. and Electronic Frontier Foundation.

October 11, 2017

**BARRON**, <u>**Circuit Judge**</u>.    These consolidated appeals concern a lawsuit that involves a number of claims arising under, respectively, federal copyright law, state tort law, and Massachusetts's catch-all consumer protection statute, Mass. Gen. Laws ch. 93A ("chapter 93A").    The defendant in the suit is Xcentric Ventures, LLC ("Xcentric"), which operates a website, the RipoffReport.com ("Ripoff Report").    The named plaintiffs are Richard Goren ("Goren"), a Massachusetts attorney; Small Justice LLC ("Small Justice"), a corporate entity that Goren created; and Christian DuPont ("DuPont").[1]  The plaintiffs' claims all pertain to a dispute arising from two reports that DuPont authored and then posted on the Ripoff Report and that are highly critical of Goren, who had provided legal representation to a plaintiff in an unrelated matter in which DuPont was the defendant.

In the first of these appeals, we affirm the District Court's decision to dismiss the plaintiffs' claims under

---

[1] We note that, on September 2, 2013, the plaintiffs filed an amended complaint that added DuPont to the case caption as a plaintiff and that described DuPont as a party to the suit.  The amended complaint, however, did not reference DuPont in the prayer for relief, even though it did reference Goren and Small Justice. Xcentric contends on appeal that DuPont was not validly made a party to the case through the amendment to the complaint.  For reasons that we will explain, we need not decide whether DuPont is properly a party and so, like the District Court, we simply refer to the "plaintiffs."

We also acknowledge the helpful amicus brief filed by Public Citizen, Inc. and Electronic Frontier Foundation.

Massachusetts law for libel and intentional interference with prospective contractual relations, and to bar portions of the plaintiffs' multi-faceted chapter 93A claim from going forward. We also affirm the District Court's decision to grant summary judgment to Xcentric as to the remaining claims. In the second appeal, we affirm the District Court's decision to award attorney's fees and costs to Xcentric.[2]

## I.

Despite the meandering path of this case, the facts that give rise to these consolidated appeals are not contested. We thus begin by laying out the facts found by the District Court in its rulings on Xcentric's motion to dismiss and on Xcentric's motion for summary judgment. We then briefly recount the facts relevant to our resolution of the second appeal, which concerns the District Court's award of attorney's fees to Xcentric.

## A.

Xcentric operates a website called the Ripoff Report. The website's purpose is to permit consumers "to post free complaints, called 'reports,' about companies and individuals whom [sic] they feel have wronged them in some manner." The website works as follows for one who wishes to post a report on it.

---

[2] Throughout the opinion, our discussion of "fees" refers to both the costs and attorney's fees available under 17 U.S.C. § 505, as well as the costs and attorney's fees discussed in Federal Rule of Civil Procedure 54(d).

Before submitting a report to be posted on the website, the would-be poster must click through a series of screens. Those screens ask the user to describe and to categorize the nature of the complaint that the user wishes to post as a report.

Ultimately, a user attempting to post a report encounters a final screen that is captioned, "Submit your Report." Below that caption is a text box. That text box is separately captioned, "Terms and Conditions," and contains a vertical scroll bar on the right side. Without employing the vertical scroll bar, a user who encounters this screen can see the very beginning -- but only the very beginning -- of what is a longer list of terms and conditions.

One of the "Terms and Conditions" -- which, according to the District Court, is "not visible unless a user employs the scroll bar" -- provides: "[b]y posting information or content to any public area of [the Ripoff Report], you automatically grant, and you represent and warrant that you have the right to grant, to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute such information and content . . . ." As the District Court noted, in order to post a report, a user is not required to click on a box indicating that the user has read and agreed to the text set forth in the text box captioned, "Terms and Conditions."

- 4 -

Underneath the text box captioned "Terms and Conditions," there is additional text that appears without any caption above it. As is relevant here, at the time in question, that text stated:

> By posting this report/rebuttal, I attest this report is valid. I am giving Rip-off Report irrevocable rights to post it on the website. I acknowledge that once I post my report, it will not be removed, even at my request. Of course, I can always update my report to reflect new developments by clicking on UPDATE.

Adjacent to this text is a check box. The parties agree that, to submit a report to be posted on the website, a user of the Ripoff Report must click on this check box. The user must then click on the "continue" button at the bottom of the same screen.

**B.**

Several years ago, Goren was the subject of two negative reports that had been posted on the Ripoff Report. The person who posted the two reports, DuPont, had been the defendant in a lawsuit in which Goren was representing a party suing DuPont. In the two postings, DuPont leveled a number of criticisms regarding Goren's character and conduct.

In response, Goren filed suit in Massachusetts state court, under Massachusetts state law, for libel and intentional interference with prospective contractual relations. Goren sought both money damages and injunctive relief in the form of an order

"enjoining [DuPont] from continuing to publish" the reports that DuPont had posted.

DuPont did not defend the lawsuit, and Goren, after first voluntarily dismissing those counts of the state court complaint that sought money damages, successfully obtained a default judgment. The state court granted Goren certain equitable relief in connection with that default judgment. Specifically, the state court enjoined DuPont from "continuing to publish or republish" the two reports that DuPont had posted. The state court also transferred to Goren "all rights in and to ownership of the copyright" for each of the two reports that DuPont had posted. Finally, the state court appointed Goren as DuPont's attorney-in-fact in order to "execute and deliver a conveyance, transfer, and assignment of all rights in and to ownership" of DuPont's copyright in each posting to Goren. Thereafter, Goren assigned to himself the copyright in the reports that DuPont had posted, which Goren then assigned to Small Justice.

## c.

The plaintiffs next proceeded to file this lawsuit in federal court in Massachusetts against Xcentric, the owner of the Ripoff Report. As amended, the plaintiffs' complaint claimed, with respect to copyright law, a right to a declaration of Small Justice's ownership of the copyright to the two reports that DuPont had posted, and copyright infringement. The amended complaint

also made claims under Massachusetts state law for libel, intentional interference with prospective contractual relations, and violations of chapter 93A.

The amended complaint sought both damages and equitable relief. With respect to equitable relief, the amended complaint sought a declaratory judgment regarding Small Justice's ownership of the copyright to each of the postings at issue. The amended complaint also sought preliminary and permanent injunctions that would bar Xcentric from "continuing to publish, and/or from republishing all or any part" of the two reports about Goren that DuPont had posted on the Ripoff Report, and that would order Xcentric "to take all steps necessary or appropriate to cause Google, Yahoo and Bing to delete all cached copies of or links to" the two negative posts.

Xcentric moved to dismiss the amended complaint in its entirety. The District Court partially granted that motion. Specifically, the District Court held that the Communications Decency Act ("CDA"), 47 U.S.C. § 230, immunized Xcentric from liability for the plaintiffs' Massachusetts law tort claims, for libel and intentional interference with prospective contractual relations, as well as from certain theories of liability set forth in the plaintiffs' chapter 93A claim.

Section 230 of the CDA provides in part: "No provider or user of an interactive computer service shall be treated as the

publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1) (emphasis added).  Section 230 defines an "interactive computer service" ("ICS") as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server."  Id. § 230(f)(2).  Subsection 230(f)(3) then defines an "information content provider" ("ICP") as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."

Xcentric argued in its motion to dismiss that it was entitled to immunity under the CDA as an ICS.  Xcentric contended that the claims at issue -- all of which were related to the Ripoff Report continuing to display DuPont's postings -- treated Xcentric as a "publisher or speaker of . . . information provided by another information content provider," see id. § 230(c)(1), namely, DuPont.

In responding to Xcentric's motion, the plaintiffs did not dispute that Xcentric was an ICS.  The plaintiffs argued instead that Xcentric was also the ICP with respect to DuPont's postings by virtue of Xcentric having held itself out as a copyright holder of DuPont's postings and having "direct[ed]" internet search engines to display copies of those postings.  Thus, the plaintiffs contended, Xcentric could not assert the immunity

conferred by the CDA as to the claims at issue, because Xcentric, as an ICS, was not being treated by those claims as the publisher of information provided by another ICP. Rather, the plaintiffs argued, Xcentric was being treated, at most, as the publisher of information content for which Xcentric itself was the ICP.

In addressing these arguments, the District Court explained that, under our decision in Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007), in order for Xcentric "[t]o avail itself of [the] immunity" set forth in § 230(c)(1), "(1) Xcentric must be a provider or user of an [ICS]; (2) the Plaintiffs' claim is based on information provided by another [ICP]; and (3) the claim would treat Xcentric as the publisher or speaker of that information." The District Court then ruled that Xcentric had made the requisite showing to trigger CDA immunity as to each of the plaintiffs' claims that Xcentric's motion to dismiss targeted, save for the plaintiffs' chapter 93A claim. The District Court ruled that, due to CDA immunity, the chapter 93A claim could go forward on only one of the three grounds for finding liability that the District Court determined that the plaintiffs had identified in that count of their amended complaint.

In finding CDA immunity, the District Court explained that Xcentric was not properly considered to be an ICP with respect to DuPont's postings because Xcentric did not "specifically encourage[] the development of the offensive content" at issue.

- 9 -

The District Court concluded that the mere acquisition of copyright to content created by another party -- or the holding of oneself out as the copyright holder of such content -- does not suffice to make an entity an ICP under § 230(f)(3). The District Court similarly concluded that "instructing Google [and other search engines] to use, or at least by not precluding Google from using, its automated program to acquire cached copies of the [postings] . . . does not rise to the level of the 'creation or development of information' that would render Xcentric an 'information content provider' under the CDA."

Following the District Court's ruling on the motion to dismiss, Xcentric filed a one-count breach-of-contract counterclaim against DuPont. The case then proceeded to discovery on that counterclaim and also on the plaintiffs' remaining claims, which consisted of the two copyright-related claims (for, respectively, a declaration of copyright ownership and a finding of copyright infringement) and, in part, the chapter 93A claim.

**D.**

In due course, Xcentric moved for summary judgment on the plaintiffs' remaining claims. The District Court granted that motion in full.[3]

---

[3] Subsequent to the District Court's summary judgment order, Xcentric moved for, and was granted, dismissal of its breach of contract counterclaim.

- 10 -

First, the District Court concluded that the plaintiffs' copyright infringement claim failed because the District Court determined that DuPont had "transferred copyright ownership to Xcentric by means of an enforceable browsewrap agreement."[4] According to the District Court, DuPont made that transfer pursuant to the Ripoff Report's terms and conditions, which provided, in part, that a user of the site agreed to "grant . . . to Xcentric an irrevocable, perpetual, fully-paid, worldwide exclusive license to use, copy, perform, display and distribute" the user's posting. Even though DuPont may not have seen the full terms and conditions prior to submitting his postings (given the configuration of the website), the District Court reasoned, DuPont was on inquiry notice of those terms and conditions because of the vertical scroll bar to the right of the text box, which was captioned "Terms and Conditions", and because of the "conspicuously visible" hyperlinks at the bottom of each page in the submission process to the website's "terms of service."

---

[4] As described by the District Court: "There are two types of contracts formed online:  'clickwrap' and 'browsewrap' agreements. Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175-76 (9th Cir. 2014).  In a clickwrap agreement, users must select a check box or radio button to indicate that they agree to the website's terms and conditions.  Id.  In contrast, browsewrap agreements do 'not require the user to manifest assent to the terms and conditions expressly.  A party instead gives his assent simply by using the website.' Id. at 1176."

In addition, the District Court granted summary judgment to Xcentric on the plaintiffs' claim for a declaratory judgment that Small Justice owned the copyright to DuPont's two postings.

Finally, the District Court addressed what remained of the plaintiffs' chapter 93A claim.  Specifically, on the sole remaining theory of chapter 93A liability, the plaintiffs contended that it was a violation of chapter 93A § 11 for Xcentric to inform users that it would never take down a posting for any reason, and simultaneously to market a program, known as the Corporate Advocacy Program ("CAP"), through which Xcentric offered to assist customers in changing their "search engine listings . . . from a negative to a positive."[5]  The plaintiffs also alleged, in support of this ground for suing under chapter 93A, that Xcentric marketed an "arbitration" program, through which Xcentric offered to redact false statements contained in postings on the Ripoff Report website.  In granting summary judgment to Xcentric as to this remaining theory of chapter 93A liability, the District Court concluded that the plaintiffs had not shown that either the CAP or the arbitration program caused them any injury.

---

[5] Chapter 93A § 11 provides a private cause of action for "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property . . . as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice."  The plaintiffs do not dispute the applicability of Section 11 to the chapter 93A count of their amended complaint.

Subsequent to issuing this initial summary judgment ruling, however, the District Court appended a footnote to that ruling that further addressed the nature of the intellectual property interest that DuPont had conveyed to Xcentric. The footnote first explained that insofar as 17 U.S.C. § 204 required "a written and signed conveyance" for DuPont to transfer a copyright to Xcentric, then DuPont's checking of the box on the "Submit your Report" page did not suffice to effect the transfer of the copyright in the postings from DuPont to Xcentric.[6] Accordingly, and notwithstanding the District Court's initial ruling -- issued prior to its adding of the footnote -- that appeared to hold the opposite, the District Court found "Xcentric was not the owner of the copyright to [DuPont's postings]."[7]

The footnote went on to hold, however, that when DuPont checked the box on the "Submit your Report" page he conveyed an irrevocable nonexclusive license to "display [his postings] in perpetuity" to Xcentric, because 17 U.S.C. § 204's requirement for

---

[6] 17 U.S.C. § 204 provides, in part, that a transfer of copyright must be effected by an "instrument of conveyance, or a note or memorandum of the transfer . . . in writing and signed by the owner."

[7] In the subsequently appended footnote, the District Court did not separately address the plaintiffs' declaratory judgment claim, wherein the plaintiffs sought to have Small Justice declared the owner of the copyright, presumably because the District Court's ruling granting summary judgment regarding copyright infringement obviated the need to resolve that issue.

a "written and signed conveyance" does not apply to a nonexclusive license.[8]  Because Xcentric possessed an irrevocable nonexclusive license to display DuPont's postings, the District Court found, DuPont had "waived his right to sue Xcentric for infringement where its use did not exceed the scope of that license."

## E.

We still have one more aspect of this saga to recount. Following the District Court's order granting Xcentric's summary judgment motion, which was issued on March 27, 2015, Xcentric moved on April 10, 2015 to recover attorney's fees and costs from the plaintiffs under 17 U.S.C. § 505.  Section § 505 permits the "prevailing party" in a copyright suit to recover costs, which include a "reasonable attorney's fee."  17 U.S.C. § 505.

Before the District Court had ruled on that motion, however, the plaintiffs, on April 24, 2015, filed a notice of appeal from the summary judgment order, and we docketed that appeal as case number 15-1506.  Thereafter, on September 30, 2015, the District Court denied Xcentric's April 10 fees award motion, but did so "without prejudice to refilling [sic] with supporting documentation."

---

[8] As 17 U.S.C. § 101 makes clear, such a license does not constitute a transfer of copyright ownership, which is the subject of 17 U.S.C. § 204.

Following that order on September 30, Xcentric, on October 20, 2015, filed a renewed fees motion. The District Court then granted that renewed motion on December 31, 2015, awarding Xcentric over $123,000 in attorney's fees and over $1,000 in costs. On the same date, the District Court also granted Xcentric's separate motion, filed on October 23, 2015, in which Xcentric requested that the plaintiffs be required to post a $30,000 appeal bond for case number 15-1506, pursuant to Rule 7 of the Federal Rules of Appellate Procedure, in order to proceed with that appeal.

The plaintiffs then separately appealed the rulings on the fees and appeal bond orders. We docketed this appeal as case number 16-1085. However, on the same day that the plaintiffs filed their fees appeal, the plaintiffs also filed motions with the District Court seeking to stay the fees award order pending their appeal and to vacate the bond order. We, thereafter, notified the plaintiffs that the notice of appeal for 16-1085 would not become effective until the District Court disposed of the post-judgment motions.

On May 2, 2016, the District Court denied the plaintiffs' motions to stay the fees award and vacate the bond order. The District Court also issued additional findings in which it further addressed the discretionary factors identified in Fogerty v. Fantasy, 510 U.S. 517, (1994), in support of the District Court's December 31, 2015 fees award. That same day, the plaintiffs'

- 15 -

notice of appeal in case number 16-1085 became effective. On June 1, 2016, the plaintiffs amended their notice of appeal in case number 16-1085 to add appellate review of the denial of their motions to stay the fees award pending appeal and to vacate the bond order, as well as the issuance of the May 2, 2016 additional findings in support of the fees award.[9]

We then, for purposes of oral argument, consolidated this appeal with appellate case number 15-1506. We now consider each appeal in turn.

**II.**

We start with the portion of the first appeal in which the plaintiffs challenge the District Court's ruling granting Xcentric's motion to dismiss as to the plaintiffs' libel and intentional interference with prospective contractual relations claims, as well as to certain aspects of the plaintiffs' chapter 93A claim.[10] The District Court premised its ruling granting the

---

[9] On January 4, 2017, this Court entered an order affirming the District Court's order imposing an appeal bond and denying the plaintiffs' motion to vacate the appeal bond. We, therefore, do not address the appeal bond herein.

[10] Xcentric contends that the plaintiffs' appeal is limited to the specific order they noticed in the notice of appeal filed on April 24, 2015 -- the District Court's summary judgment decision, rather than its earlier decision to grant, in part, Xcentric's motion to dismiss on the basis of immunity under the CDA. We need not decide this issue, however. See Parkview Adventist Med. Ctr. v. United States, 842 F.3d 757, 760 (1st Cir. 2016) (non-Article III jurisdictional defects may be bypassed if the merits clearly favor the party asserting the defect).

motion on the immunity that it found that § 230 of the CDA conferred on Xcentric.  We review that ruling de novo, asking "whether the well-pleaded factual allegations, viewed in the light most favorable to the plaintiff, state a claim for which relief can be granted."  Germanowski v. Harris, 854 F.3d 68, 71 (1st Cir. 2017) (citing Ocasio-Hernández, v. Fortuño-Burset, 640 F.3d 1, 7 (1st Cir. 2011)).  For the reasons that follow, we affirm.

The plaintiffs appear to concede that the Ripoff Report qualifies as an ICS under § 230 and, thus, that Xcentric enjoys immunity under that section from claims that would treat it "as the publisher or speaker of any information provided by another [ICP]," 47 U.S.C. § 230(c)(1).  See Klayman v. Zuckerberg, 753 F.3d 1354, 1358 (D.C. Cir. 2014) ("[A] website does not create or develop content when it merely provides a neutral means by which third parties can post information of their own independent choosing online.").  However, the plaintiffs contend that Xcentric may not claim CDA immunity under § 230 because the plaintiffs contend that those postings do not constitute "information provided by another [ICP]."  47 U.S.C. § 230(c)(1).

According to the plaintiffs, Xcentric became the ICP with respect to those postings in either of two ways.  First, Xcentric allegedly became the ICP by claiming "ownership of the exclusive rights of copyright" in DuPont's postings and -- pursuant to that claimed copyright -- "initially publish[ing], and

- 17 -

continu[ing] to publish, [DuPont's] defamation on its Ripoff Report website." Second, Xcentric allegedly became the ICP of the information at issue because, "even assuming the initial publication to be immune, Xcentric authorizes and directs Google and other search engines to make copies of [the postings]." The plaintiffs thus argue that Xcentric became an ICP when those "search engines display copies of the defamation on their servers."

We do not agree. As we explained in Lycos, immunity under § 230 should be "broadly construed." 478 F.3d at 418-19. In fact, we noted there that Congress has expressed a "policy choice . . . not to deter harmful online speech through the . . . route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." Id. at 418(quoting Zeran v. Am. Online, Inc., 129 F.3d 327, 330-31 (4th Cir. 1997))(omissions in original). Given that legislative policy choice, we do not see how we can construe the CDA's definition of an ICP -- which provides that an ICP is a "person or entity that is responsible . . . for the creation or development of information[,]" 47 U.S.C. § 230(f)(3) -- to encompass Xcentric in this case.

Such a construction of this statutory definition of an ICP would flout Congress's intent by wrongly preventing an ICS like Xcentric from claiming immunity. Lycos, 478 F.3d at 418. As the plaintiffs recognize, Xcentric did not alter the content of

the information DuPont posted such that Xcentric could be said to have been "responsible for . . . creat[ing] or develop[ing]" that content by reason of having actually authored it, whether in whole or in part. In addition, as the District Court found, nothing in the amended complaint indicates that Xcentric, simply by holding itself out as the copyright holder of the postings or by directing search engines to cache DuPont's postings on their websites, "specifically encourage[d]" the content set forth in DuPont's postings.

In fact, a sister circuit has rejected the view that an ICS, by merely providing such direction to search engines with respect to information the ICS has not altered, becomes an ICP of that information. See Kimzey v. Yelp! Inc., 836 F.3d 1263, 1270-71 (9th Cir. 2016) ("Yelp is not liable for disseminating . . . [user-generated] content in essentially the same format to a search engine, as this action does not change the origin of the third-party content." (citing Ascentive, LLC v. Op. Corp., 842 F. Supp. 2d 450, 476 (E.D.N.Y. 2011))); see also Ayyadurai v. Floor64, Inc., No. 17-10011-FDS, 2017 WL 3896668, *17 (D. Mass. Sept. 6, 2017) (analyzing cases from other circuits which determined that "republishing and commenting upon user generated content, does not constitute 'creation or development.'" (citation omitted)). And we do not see why that conclusion should differ if the ICS also represents that it holds the copyright. Nor are we aware of any

- 19 -

precedent that requires a contrary conclusion. Accordingly, we affirm the District Court's ruling on the motion to dismiss.

## III.

We now consider the District Court's order granting summary judgment to Xcentric. Our review here, too, is de novo. Santos-Rodríguez v. Seastar Sols., 858 F.3d 695, 697 (1st Cir. 2017). In undertaking that review, we must assess "the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in that party's favor." Id.

## A.

We start with the portion of the summary judgment order concerning the plaintiffs' two copyright claims. As to the copyright infringement claim, the District Court concluded, through the footnote that it appended to its initial ruling granting summary judgment to Xcentric, that Xcentric could not be liable for infringement due to the nonexclusive license that Xcentric had received from DuPont. The District Court concluded that "DuPont conveyed a nonexclusive, irrevocable license to Xcentric to display the [two postings]" when DuPont clicked the check box next to the accompanying text stating that a user who posts on the Ripoff Report agrees to give an "irrevocable right[]" to Xcentric to display his postings on the Ripoff Report website. As a result, the District Court held, even if Xcentric was not "the owner of the copyright to [DuPont's postings]," Xcentric could

nevertheless "display them in perpetuity" without infringing DuPont's copyright.

In arguing otherwise, the plaintiffs do not dispute that "[u]ses of the copyrighted work that stay within the scope of a nonexclusive license are immunized from infringement suits." John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26, 40 (1st Cir. 2003) (citing Graham v. James, 144 F.3d 229, 236 (2d Cir. 1998)). The plaintiffs also do not contend, at least in their opening brief, that Xcentric exceeded the scope of the nonexclusive license, insofar as Xcentric had that license.[11] Instead, the plaintiffs contend that Xcentric did not obtain a valid nonexclusive license to display DuPont's postings for two reasons.

First, the plaintiffs argue that Xcentric offered no consideration for the irrevocable nonexclusive license that the District Court ruled Xcentric had been given by DuPont. The plaintiffs thus argue that, in consequence, no valid contract

_____

[11] In their reply brief, for the first time, the plaintiffs argue the scope of the nonexclusive license was only "to post [the defamatory report] on the website" and that Xcentric exceeded that scope of the license by "add[ing] its notice of copyright ownership to each report, tag[ging] the report with codes and instructions to allow Google and other third-party search engines to index and also to display copies of it extrinsic to the website." But, arguments developed for the first time in a reply brief are waived. See Braintree Labs., Inc. v. Citigroup Glob. Markets Inc., 622 F.3d 36, 44 (1st Cir. 2010) (finding waived an argument cursorily mentioned in appellant's opening brief, as even "[t]he slight development in the reply brief does nothing to help matters, as arguments raised there for the first time come too late to be preserved on appeal").

existed that could have conveyed the license to Xcentric. In support of this contention, the plaintiffs point to the website's terms and conditions, which the plaintiffs contend were "subject to change by Xcentric, at any time" and without notice to DuPont, and that "it is undisputed that Xcentric [has redacted information] from posted reports and has removed reports upon the request of the author." The plaintiffs thus argue that the only possible promises that Xcentric made to give something in consideration for the license were "illusory" and, thus, in fact "Xcentric promised nothing" and, therefore, "gave no consideration."

The problem with this argument, however, is that, even if consideration is necessary in order for a party to grant an irrevocable nonexclusive license, see 3 Nimmer on Copyright § 10.03 (Rev. ed. 2017)(explaining that "consideration is necessary to render a nonexclusive license irrevocable"), performance can itself constitute consideration sufficient to establish a binding contract. And, in this case, the plaintiffs concede that Xcentric did actually post the reports at issue. Thus, given that performance, the plaintiffs offer no authority or persuasive argument as to why there is insufficient consideration for the conveyance of the irrevocable nonexclusive license in this case. See 3 Williston on Contracts § 7:15 (4th ed. 2008) ("[T]hat the purported consideration is invalid will not cause a subsequent performance to be likewise invalid . . . . [A] performance which

has been rendered needs no consideration though the promise to give it originally did.  Since the performance has been rendered . . . and . . . received as the consideration for the promise, the promise thereby becomes binding.").

Second, the plaintiffs contend that the irrevocable nonexclusive license is unenforceable on public policy grounds. The plaintiffs' argument here is that Xcentric's promise not to remove any postings -- even if the postings are libelous -- is contrary to the public policy "against per se libel."  But, while the plaintiffs contend that there is a "strong public policy against per se libel[,]" the plaintiffs offer no basis for concluding that this public policy provides a reason to hold the nonexclusive license itself invalid.  The fact that one holds such a license does not in and of itself protect one from liability for libeling another.  Furthermore, even assuming that DuPont's postings were per se libelous, no aspect of copyright law protects the holder of such a license from liability for libel, and nothing in the District Court's opinion suggests otherwise.  Thus, the plaintiffs' assertion that there is a public policy against per se libel fails to show that this nonexclusive license may not be enforced.

There remains only the other copyright claim to address: the declaratory judgment claim in which the plaintiffs argue the copyright to DuPont's two postings belongs to Small Justice and

not to Xcentric. The plaintiffs contend that the District Court erred insofar as it granted summary judgment to Xcentric on the ground that Xcentric had acquired the copyright to each of DuPont's postings.[12] But the plaintiffs advance this argument only in connection with their claim that there was no agreement that ever effected a valid transfer of copyright and, thus, that DuPont and not Xcentric "retained ownership of the exclusive rights of copyright to the defamatory postings".[13] We thus deemed waived any independent contention that the District Court erred in not issuing a ruling as to whether Small Justice validly holds copyright to DuPont's postings. See United States v. Zannino, 895 F.2d 1, 17

---

[12] In light of the District Court's subsequently appended footnote, it is not clear that the District Court actually issued a ruling as to whether Small Justice, in fact, holds the copyright to DuPont's postings. Rather, the District Court appears to have concluded only that Xcentric is not the copyright holder.

[13] The plaintiffs' only request for a declaration of ownership in their amended complaint was a request for a declaration confirming Small Justice's ownership of the copyright to each of the two posts at issue. After the District Court's summary judgment ruling and appended footnote issued, DuPont moved to further amend the complaint to include a request for a declaration that DuPont owned the copyright for each of the postings or, alternatively, a declaration that the nonexclusive license DuPont allegedly granted Xcentric was unenforceable as contrary to public policy. The District Court denied DuPont's motion, as judgment had already entered and DuPont failed to provide an adequate reason for his delay in seeking the amendment, which was prejudicial to Xcentric, "given that the Plaintiffs were aware of the facts underlying their claim when they filed their first two complaints." The plaintiffs did not appeal the denial of the motion to amend.

- 24 -

(1st Cir. 1990).  And, therefore, we need not consider this issue further.[14]

**B.**

We turn, then, to the last remaining portion of the plaintiffs' summary judgment challenge.  This portion concerns the plaintiffs' claim that, contrary to the District Court's ruling, Xcentric violated chapter 93A § 11 by "advertising and operation of its reputation restoration business."  In briefing to the District Court, the plaintiffs described the chapter 93A claim more particularly as one that seeks to hold Xcentric liable for its "solicitation of victims who have been defamed by works that Xcentric has published under color of its [claimed copyright] ownership to pay Xcentric to restore their reputation on search engines."  To support this contention on appeal, the plaintiffs point to Xcentric's "alternative commercial fee based solutions for the subjects of false and/or defamatory reports" -- the CAP and the arbitration program -- "whereby for some undisclosed fee

---

[14] We thus need not address the question of whether the Massachusetts state court decision violated Rule 54(c) of the Massachusetts Rules of Civil Procedure, which requires that "[a] judgment by default shall not be different in kind from . . . that prayed from in the demand for judgment," nor whether that court's judgment transferring DuPont's copyright to Goren pursuant to a default judgment is a valid transfer of copyright under 17 U.S.C. § 201(e).  We likewise need not address whether a browsewrap agreement may satisfy the writing requirement in 17 U.S.C. § 204.

- 25 -

Xcentric would 'restore [a subject's] reputation," "by redaction or removal of a defamatory report."

The problem for the plaintiffs, however, is that, as the District Court correctly ruled, causation -- both "factual" and "proximate" -- is a required element of a chapter 93A claim. Walsh v. TelTech Sys., Inc., 821 F.3d 155, 160 (1st Cir. 2016) (citing Hershenow v. Enterprise Rent-A-Car Co. of Bos., 840 N.E.2d 526, 535 (Mass. 2006), and McCann v. Davis, Malm & D'Agostine, 669 N.E.2d 1077, 1079 (Mass. 1996)). Moreover, as the plaintiffs concede, with respect to a chapter 93A § 11 claim, plaintiffs must demonstrate a causal link between Xcentric's allegedly "unfair or deceptive" business practices and a "loss of money or property" by the plaintiffs. Mass. Gen. Laws ch. 93A § 11. Yet the plaintiffs do not explain how the CAP or the arbitration program caused them any such loss.

In particular, the plaintiffs do not point to any evidence in the record that DuPont's initial postings were motivated or in any other way caused by the existence of CAP or the arbitration program. Nor do the plaintiffs point to any evidence in the record that Xcentric's Ripoff Report business depends on individuals in Goren's position paying to participate in one or both of the programs. Thus, the plaintiffs do not link the money or property that they allegedly lost due to the postings themselves to the CAP or to the arbitration program. In addition,

- 26 -

the plaintiffs do not challenge the District Court's finding that they did not incur the cost of participating in either Xcentric's CAP or its arbitration program. Accordingly, we see no error in this aspect of the District Court's summary judgment ruling.[15]

**IV.**

We turn, then, to the second of the consolidated appeals at issue. In this appeal, the plaintiffs challenge the District Court's decision to award over $123,000 in attorney's fees and over $1,000 in costs to Xcentric. The plaintiffs argue that the District Court erred in three different ways in awarding fees to Xcentric. First, the plaintiffs contend, pursuant to Federal Rule of Civil Procedure 54(d)(2)(B), that Xcentric's fees motion was untimely. Next, the plaintiffs contend that Xcentric is not a "prevailing party" under 17 U.S.C. § 505 and thus is not entitled to a fees award. Third, the plaintiffs argue that the District Court incorrectly applied the factors the Supreme Court identified

---

[15] In support of their contention that the District Court erred in granting summary judgment with respect to their chapter 93A claim, the plaintiffs appear to argue that a misrepresentation at one point in the litigation by Xcentric regarding the specific text stating the terms of the clickwrap agreement, though later corrected, should be added to the analysis of pre-suit acts referred to in the amended complaint for motion to dismiss purposes. As an initial matter, and especially in light of the correction, it is not clear that Xcentric's conduct, as alleged, constitutes bad faith. But in any event, and more importantly, we fail to see how Xcentric's litigation conduct, which is clearly outside the scope of the amended complaint constitutes an actionable claim under chapter 93A as pleaded.

in Fogerty, to guide analysis of whether fees should be awarded in a particular instance.

The parties agree that we review the District Court's rulings on the fees award for abuse of discretion. See Airframe Sys., Inc. v. L-3 Commc'ns Corp., 658 F.3d 100, 108 (1st Cir. 2011). And, for the reasons we now lay out, we reject each of the plaintiffs' arguments for finding such an abuse. Accordingly, we affirm the District Court's fees award.[16]

**A.**

With respect to the plaintiffs' argument concerning the timeliness of Xcentric's fees motion, Rule 54 requires that a motion for attorney's fees "be filed no later than 14 days after the entry of judgment," "unless . . . a court order provides otherwise." Fed. R. Civ. P. 54(d)(2)(B).[17] As the plaintiffs

---

[16] The plaintiffs separately appeal the District Court's denial of the plaintiffs' motion to stay, pending appeal, the execution of the December 31, 2015 fees award. However, as the only arguments that the plaintiffs make on appeal that could bear on this issue -- insofar as it is not now moot -- concern the merits of the fees award, we reject this challenge by the plaintiffs for the same reasons that we reject their challenge to the fees award.

[17] The parties' assume that Rule 54(d)(2) is applicable to Xcentric's fees motion under § 505, and we proceed on that assumption. See Evolution, Inc. v. Suntrust Bank, No. Civ. A. 01-2409-CM, 2005 WL 1936019, at *1 (D. Kan. Aug. 8, 2005); Video-Cinema Films, Inc. v. Cable News Network, Inc., Nos. 98 Civ. 7128(BSJ), 98 Civ. 7129(BSJ), 98 Civ. 7130(BSJ), 2003 WL 1701904, at *2 (S.D.N.Y. Mar. 31, 2003); Mattel, Inc. v. Radio City Entm't, 210 F.R.D. 504, 505 (S.D.N.Y. 2002); Brewer-Giorgio v. Bergman, 985 F. Supp. 1478, 1482 (N.D. Ga. 1997).

concede, Xcentric first filed a motion for fees on April 10, 2015, which was -- the plaintiffs agree -- within 14 days of the District Court's March 27, 2015 summary judgment order. Thus, the plaintiffs premise their challenge to the timeliness of the fees motion on the following additional facts.

First, the plaintiffs point out, the District Court did not rule on Xcentric's April 10 motion until September 30, 2015 and, in doing so, dismissed that motion. Second, the plaintiffs note, Xcentric then filed a renewed fees motion on October 20, 2015, which was obviously more than 14 days after the District Court's March 27 summary judgment order and more than 14 days after the District Court's denial of Xcentric's April 10 fees motion. Accordingly, the plaintiffs contend that the only operative fees motion before us -- which is the renewed fees motion that the District Court granted on December 31, 2015 -- was not timely filed under Rule 54.

But the plaintiffs are clearly wrong. The District Court denied Xcentric's timely filed April 10 fees motion in its September 30 order "without prejudice to refilling [sic] with supporting documentation."[18] Thus, in denying the timely-filed

---

[18] Though the District Court denied the plaintiffs' motion for a lack of "supporting documentation," notably the Advisory Committee on the Federal Rules of Civil Procedure has stated that Rule 54 "does not require that the [fees] motion be supported at the time of filing with the evidentiary material bearing on the

April 10 fees motion, the District Court issued "a court order provid[ing] otherwise," id., with respect to the timing for filing a renewed fees motion. And, thereafter, Xcentric filed a renewed motion less than a month later.

Significantly, the District Court's September 30 order did not provide an express time limit for Xcentric to file such a renewed fees motion. And, insofar as the September 30 order contained an implicit reasonableness requirement as to the timing of the filing of such a renewed fees motion, we see no basis for concluding that Xcentric's renewed fees motion was filed so late as to be out of compliance with any such implied deadline. We thus reject the argument that the fees award was premised on a motion that was untimely under Rule 54 or in any other respect. Cf. Pierce v. Barnhart, 440 F.3d 657, 664 (5th Cir. 2006) (finding that, where a district court denied plaintiffs' attorney's fees motion without prejudice, but also without a stated deadline for refiling, "the district court gave the plaintiffs the opportunity to refile their [fees motion] at a later date, even if their refiling[] fell outside of the fourteen-day time period prescribed

---

fees. This material must of course be submitted in due course, according to such schedule as the court may direct in light of the circumstances of the case. What is required is the filing of a motion sufficient to alert the adversary and the court that there is a claim for fees, and the amount of such fees (or a fair estimate)." Advisory Committee Note to 1993 Amendment of Fed. R. Civ. P. 54(d)(2)(B).

- 30 -

by Rule 54(d)" and "[i]n essence, the district court provided no time limitations for the plaintiffs' second . . . attorney's fees [motion], which was well within the court's discretion under Rule 54(d)").

**B.**

We also reject the plaintiffs' contention that Xcentric is not a "prevailing party" under 17 U.S.C. § 505.[19] Specifically, the plaintiffs argue that the District Court erred in failing to analyze whether, under the Supreme Court's construction of § 505 in Buckhannon Bd. & Care Home, Inc. v. West Virginia Dept. of Health & Human Res., 532 U.S. 598, 604-05 (2001), a "material alteration of the legal relationship of the parties," coupled with a "judicial imprimatur on the change" had occurred. According to the plaintiffs, the District Court resolved the parties' copyright dispute on standing grounds "without reaching the merits of ownership."

As we have observed, however, even if a "copyright case [is] won because the defendant failed to answer the complaint or [is] lost because of a discovery violation by the plaintiff . . . surely the winner could claim attorney's fees and costs" under

---

[19] Section 505 provides: "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof.  Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." Id. (emphasis added).

§ 505. InvesSys, Inc. v. McGraw-Hill Cos., 369 F.3d 16, 20 (1st Cir. 2004); cf. CRST Van Expedited, Inc. v. EEOC, 136 S. Ct. 1642, 1646, 1951 (2016) (noting that the Court has interpreted "the term 'prevailing party' in various fee-shifting statutes [including § 505] . . . in a consistent manner" and holding that under a different fees statute, a party "may prevail even if the court's final judgment rejects [the opposing party's] claim for a nonmerits reason"). We thus do not see how this contention by the plaintiffs provides a basis for finding that the District Court abused its discretion in concluding that Xcentric was a "prevailing party" under § 505.

## c.

Finally, the plaintiffs contend that the District Court abused its discretion in applying the nonexclusive Fogerty factors that the Supreme Court has identified to guide district courts in awarding attorney's fees. Here, too, we disagree.

In Fogerty, the Supreme Court identified the following "nonexclusive factors" that courts should consider in making awards of attorney's fees under § 505, provided that "such factors are faithful to the purposes of the Copyright Act and are applied to prevailing plaintiffs and defendants in an evenhanded manner": "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of

- 32 -

compensation and deterrence." 510 U.S. at 534 n.19. On appeal, the plaintiffs contend that the District Court erred in applying these factors in several respects.

First, the plaintiffs contend that their litigation advanced the purposes of the Copyright Act, and thus that the District Court's application of the Fogerty factors was not "faithful to the purposes" of that Act. The plaintiffs base this contention on the fact that their lawsuit clarified for future litigants that "the writing requirement of 17 U.S.C. § 204 makes a browsewrap agreement insufficient to effectuate a transfer of copyright." The plaintiffs further contend that this litigation raised a number of other "novel and complex issues."[20] And, finally, the plaintiffs argue that they litigated the case in good faith and that the District Court was wrong to conclude that the factors of compensation and deterrence supported Xcentric's fees award.

The Supreme Court has emphasized, however, that "§ 505 confers broad discretion on district courts and, in deciding whether to fee-shift, they must take into account a range of

---

[20] Those issues included (1) "[w]hether DuPont granted Xcentric an exclusive license when he checked the box"; (2) "[w]hether the copyright assignment from DuPont to Goren and Small Justice pursuant to the Superior Court judgment was a valid transfer of copyright"; (3) "[t]he scope of the copyright Xcentric claimed to own (but did not)"; and (4) "[w]hether an [ISP] that claims copyright ownership over defamatory content becomes responsible for it, thus eliminating its [CDA] immunity."

considerations beyond the reasonableness of litigating positions." Kirtsaeng v. John Wiley & Sons, Inc., 136 S. Ct. 1979, 1988 (2016). We, too, have explained that review of a district court's application of the Fogerty factors is "extremely deferential," such that "we will set aside a fee award only if it clearly appears that the trial court ignored a factor deserving significant weight, relied upon an improper factor, or evaluated all the proper factors (and no improper ones), but made a serious mistake in weighing them." T-Peg, Inc. v. Vermont Timber Works, Inc., 669 F.3d 59, 61-62 (1st Cir. 2012) (citation and quotation marks omitted). After all, "the trial court is in the best position to gauge the bona fides of a request for fees." Spooner v. EEN, Inc., 644 F.3d 62, 70 (1st Cir. 2011). And, here, we conclude that with respect to the Fogerty factors, the District Court did not abuse the broad discretion that § 505 confers in awarding fees to Xcentric.

As in T-Peg, the District Court "provided plenty of reasoning in support of its award" -- offering "explanation and analysis" that was "not just reasonable but thoughtful." 669 F.3d at 63-64. Regarding whether the plaintiffs' claims "were objectively unreasonable under Fogerty," the District Court explained that, although it was "not prepared to say that the [plaintiffs'] claims were wholly without merit, or that [p]laintiffs' appeal regarding same [was] frivolous," "the legal and factual basis for same" was "at best questionable." And this

conclusion tracked the District Court's detailed analysis in its order granting Xcentric's motion for summary judgment on the copyright-related claims.

With regard to "[t]he Fogerty factors of compensation and deterrence," moreover, the District Court concluded that the fees award was supported by "[t]he protracted nature of the case, lasting more than two years," and because "Xcentric [, as the defendant,] litigated without the prospect of an award of damages" and that "the award it [sought] regarding fees and costs would vindicate its defense on the merits." The District Court further concluded that the "degree of success Xcentric obtained also support[ed] an award," as "Xcentric prevailed on all of [p]laintiffs' claims," and "Xcentric's sole counterclaim was dismissed not on the merits, but on its own motion."

The plaintiffs also contend that the fees award is problematic because they litigated in good faith. However, we have explained that Fogerty "expressly rejected the practice of requiring a showing of . . . bad faith before a prevailing [party]

could be awarded attorney's fees."  See Airframe Sys., 658 F.3d at 108.  We thus affirm the fees award.[21]

**V.**

For the foregoing reasons, we **affirm** the District Court's March 2014 partial grant of Xcentric's motion to dismiss, the District Court's March 2015 grant of summary judgment in favor of Xcentric, the District Court's December 31, 2015 fees award order, and the District Court's May 2, 2016 orders related to the fees award.

---

[21] The plaintiffs separately contend that the District Court abused its discretion by making a finding as to prevailing hourly rates that they contend was impermissibly based solely on Xcentric's attorneys' affidavits.  The plaintiffs, however, do not dispute that Xcentric submitted a 2013 survey done by the American Intellectual Property Law Association documenting prevailing rates in the Boston area, or that Xcentric referenced recent fee awards made by federal district judges in Massachusetts.  We thus conclude that the District Court did not abuse its discretion in concluding that the record reflects that "actual attorney rates billed were less than prevailing rates."